[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a civil action brought by the landlord, Samuel J. Heyman (L) against a tenant, two brothers, Taolung and Tao-Cheng Chen (T) operating a restaurant on the subject premises to recover damages for breach of a commercial lease. On or about 5/1/79 L entered into 10 yr lease (expiring 4/30/89) with Jolly Pizza Pub, Inc. [Exhibit A] On or about 5/1/82 Jolly Pizza assigned its interest in said lease to J. J. Chen with consent of L. to operate a Chinese restaurant. [Ex B]. On or about 6/15/86 J. J. Chen assigned his interest in said lease to the named defendants. [Ex C]. This assignment was consented to by L after certain modifications to lease were made regarding an increase in security deposit and waiver of interest thereon, etc. [See Ex C]. Pursuant to terms of lease T could extend lease for an additional 10 year term by exercising this option 1 year prior to expiration. [Sec 31.01 lease] T failed to timely exercise this option. Nevertheless, upon T's oral pleas, L consented to the extension sending a written confirmation of same [see Ex D]. Although there was no written memorandum of this agreement, on/about 9/88 the lease was extended for an additional 10 yr term to expire on or about 4/99.
Performance of T's obligations under lease were uneventful until 8/90 when T failed to pay rent for August. September and October, 1990. On or about 11/2/90 L sent T a default letter to cure this default. T failed to cure said CT Page 9470 default and on 11/12/90 L terminated said lease by serving T with a Notice to Quit. [Ex G]
Subsequent to receiving the N/Q, T contacted L and pleaded with L not to evict T. As a result, L T entered into a conditional re-instatement agreement [Ex H] to reinstate T upon fulfillment of certain conditions, one of which was to eliminate the arrearage. Some time during December, 1990 T paid $30,000 pursuant to this agreement, but failed to comply with the remaining two conditions and L directed its attorneys to proceed with the eviction. Consequently, on 1/10/91 a summary process action was initiated [per summary process file # SPNO 9101-10730, Judicially noticed]. While this action was pending T filed for Bankruptcy and obtained a stay of the eviction proceeding. On or about 5/2/91 L obtained relief from the stay and judgement for immediate possession in the eviction action was entered against T, Id., from which T appealed. This appeal was dismissed on or about 7/1/91. Id. On or about July 30, 1991 an execution was issued and T vacated premises pursuant thereto.
While the eviction proceedings were pending, L, anticipating defendants vacation, sought to re-let premises and made efforts to identify potential tenants by contacting existing tenants in other locations it owned as well as local real estate brokers. These efforts resulted in only one potential tenant being identified. K B Toys (KB) was the only entity seriously interested in leasing the subject premises. Negotiations ensued and in July, 1991 L entered into a 10 year lease with KB to commence on/about 10/91.
The period during which T occupied the subject premises after the service of the notice to quit (11/12/90 — 8/5/91) L's Director of Real Estate opined that the fair rental value of the subject premises ranged from $25/sf for "triple A rated" tenants to $27/sf for "unrated" tenants. It is undisputed that the subject premises consisted of 4070 square feet. No other evidence of the fair rental value of the subject premises was offered.
As a condition of the re-letting agreement L was to renovate the premises to KB's specifications. These renovations were commenced immediately following T vacating the premises on/about July 30, 1991. Renovation operations CT Page 9471 continued for approximately two months until the end of September, 1991 during which commercial occupancy of the premises was impossible due to the renovation activity. On/about October 13, 1991 KB took occupancy of the subject premises pursuant to the re-letting agreement. It is undisputed that the KB lease completely discharged the defendants of any obligations remaining under their lease at least from October 1, 1991.
L brought the instant action against the defendants to recover for back rent owed prior to the service of the notice to quit, use and occupancy for the period between the time of the service of the notice to quit and the last date of the defendants' occupancy and, for future lost rent, re-letting costs and waste as damages for breach of the lease.
T claims that L is not entitled to back rent because no lease either existed between the parties for the period in question or that it is unenforceable under the statute of frauds; that any use and occupancy recoverable can only be computed at the rate of $25 sq/ft as established by the plaintiff's evidence; that plaintiff is not entitled to any damages pursuant to the lease agreement or because the renovations undertaken were unreasonable.
In order to resolve the disputes raised by these claims the court must examine the relationships between these parties during 3 periods which the abovementioned claims put into issue. They may be characterized as follows:
 Period I, the leased period: 5/1/79 — 11/12/90 Period II, the terminated period: 11/13/90 — 7/30/91 Period III, the renovation period: 8/2/91 — 10/1/91.
 I The Leased Period
It is undisputed that the lease between the plaintiff and the original tenant, Jolly Pizza Pub, Inc. was properly assigned to the defendant in this case. That lease expired by its terms on April 30, 1989. Under the terms of said lease it could be extended on terms specified in the original lease for another 10 year period by the tenant exercising this option in writing one year prior to expiration. In this case the defendants failed to make such an election within CT Page 9472 the time limited. However, the defendant did make an untimely oral request which was accepted by L and confirmed by letter. There was, however, no document containing the signature of the party to be charged. This is the basis of the defendants' claim that any agreement to lease for the additional 10 year period was nonexistent or unenforceable under the statute of frauds.
The court disagrees. The exercise of an option to extend the term of a lease, as distinguished from an option to renew, does not require any additional instrument beyond the original lease to give it validity. This is because the original lease contains all of the essential terms of the extended lease. Blanck v. Kimland Realty Co., 122 Conn. 317,320 (1937). See also, Cunningham, Stoebuch Witman, THE LAW OF PROPERTY, Landlord Tenant, sec 6.60 pp. 376 et seq. (1984). Consequently the statute of frauds is satisfied by the original lease. City Coal Co. v. Marcus, 95 Conn. 454,459 (1920). Furthermore, the fact that section 31.01 of the lease required the exercise to be in writing is not conclusive of the issue. See, Corthouts v. Connecticut Fire Safety Services Corporation, 2 Conn. Cir. 34, 38-39 (1963). The requirement of a written exercise may be waived by the landlord. See, Adam v. Consolini, 135 Conn. 321, 324 (1949). Furthermore, whether the option was effectively exercised is a question of fact which is determined by looking the the intention of the parties as expressed in their words and deeds. Zuckerman Group v. Raveis, 4 Conn. App. 568, 571-72
(1985). Finally, the act of holding over together with the payment of the agreed upon rental has been held sufficient conduct to constitute an effective exercise despite the absence of a writing. Corthouts, supra, 39; Zuckerman Group v. Raveis. 4 Conn. App. 568, (1985); Blanck v. Kimland Realty Co., 122 Conn. 317, 320 (1937); THE LAW OF PROPERTY, Landlord Tenant, supra. sec 6.61, p. 378. In the case at bar it is undisputed that L's director of Real Estate acceded to T's request to extend despite the lack of a writing. Further, at the end of the term of the original lease the defendants heldover and continued to pay the increased rental. Significantly, this increase was a cost of living increase provided for in the original lease in the event of an extension. These facts lead inescapably to the conclusion that by their conduct, as aforesaid, the parties intended that said lease be extended and that an option to that effect had been effectively exercised. For these reasons the court CT Page 9473 concludes that a lease did exist between the parties during this period and was not subject to a statute of frauds defense.
In view of the abovementioned finding the defendants were obliged to pay rent, additional rent and any other expenses, including reasonable attorneys fees, provided for in the original lease. In this connection the court finds that the defendant defaulted in the payment of rent, additional rent and reimbursement for the water use (notes @ p. 6) [Exhibits W X] by failing to pay same when due as follows:
 Minimum rent for Aug, Sep, Oct 12 days in Nov, 1990[1]
@ $7,626.66/mo or $254.22/day $25,930.62
 Additional Rent (Common Area Maintenance [CAM]) for the aforesaid period[1]
@ $1,078.93/mo or $35.96/day 3,662.31
 Water Charges from 6/26/90 through 11/12/90[2] 2,317.87 ---------- Total Back Rent Damages $31,910.80
Accordingly, the court finds the plaintiff has sustained damages prior to the termination of the lease in the amount of $31,910.80.
 II The Terminated Period
It is undisputed that L terminated the Jolly Pizza Pub lease (as extended) on Nov 13, 1990. It is well settled that the termination of a lease by a notice to quit transforms the prior tenancy into a tenancy at sufferance. O'Brien Properties, Inc. v. Rodriguez, 215 Conn. 367, 372 (1990); Lonergan v. Connecticut Food Store, inc, 168 Conn. 122, 131 (1975); Buccino v. Cable Technology, Inc., 25 Conn. App. 676, 680 (1991). If the tenant continues thereafter to occupy the subject premises, the landlord is not entitled to rent, but is entitled to recover for use and occupancy as measured by the fair rental value of the CT Page 9474 premises. O'Brien Properties, Inc. v. Rodriguez, supra; Rokalor, Inc. v. Connecticut Eating Enterprises, Inc., 18 Conn. App. 384,388-89 (1989); Sippin v. Ellam, 24 Conn. App. 385, 391 (1991); Buccino v. Cable Technology, Inc., supra.
In the case at bar the defendants continued to occupy the subject premises subsequent to the service of the notice to quit until July 30, 1991. Under the aforementioned rules, the plaintiff is entitled to recover use and occupancy for the period from Nov 13, 1990 through July 30, 1991 inclusive, a period of eight (8) months and 18 days. The parties have agreed with this principle in general, but are in dispute as to what the fair rental value was for this period. The plaintiff claims that it should be computed on the basis of the last agreed upon rental. 47a-3c, 47a-26b, CGS; see also, Farber v. Wards Co. Inc., 825 F.2d 684, 689 (2d Cir, 1987). Applying these principles to the instant case the fair rental value would amount to $7,626.66 (basic monthly rent) + $1,078.93 (monthly CAM) = $8,705.59 x 8 months or $69,644.72 + $5,223.42 ($290.19/day x 18) or $74,868.14.
The defendants, on the other hand, point out that the this principle is only followed in the absence of actual evidence of fair rental value. Farber v. Wards Co. supra. The court agrees. Where the landlord offers proof of the fair rental value, he cannot rely on the aforementioned presumption as evidence of same since the presumption has been rebutted by the evidence of the actual value of the demised premises. The court agrees. Id.; see Queen v. Gagliola, 162 Conn. 164, 170 (1972) as to the applicability of a evidentiary presumption [res ipsa loquitur] and Felsted v. Kimberly Auto Services, Inc., 25 Conn. App. 665,670 (1991) as to the applicability of a statutory presumption where the jury finds the inferences have been proven by the evidence].
In the case at bar, although the plaintiff offered evidence as to two applicable rates ($25/sf and 27/sf), there was no evidence offered as to the precise fair rental value of these premises during the period in question. Therefore, in the absence of sufficient evidence in the record from which the court can determine without resort to speculation which rate is the proper rate to apply to the disputed period, it must therefore resort to the presumption to arrive at the fair rental value. Farber v. Wards Co., supra.[3]
Accordingly, the court finds the plaintiff sustained damages CT Page 9475 for use and occupancy for the period between Nov 13, 1990 and July 30, 1991 in the amount of $74,868.14.
 III The Renovation Period
The final issues in dispute relate to that period following the defendant's relinquishment of possession of the subject premises.
In addition to the lost rental the plaintiff claims he is also entitled costs he incurred for renovations and repairs. The defendants claim that plaintiff is not entitled to any damages for loss of rent because the premises were uninhabitable due to renovation work during the disputed period or, in the alternative, is not entitled to the costs of renovation and repairs because he relinquished his right to same when he exercised his option to terminate under the lease.
With regard to the lost rental, the court finds that the plaintiff is entitled to recover such damages. It is well settled that upon the breach of the lease the landlord has two options: either to terminate the lease and sue for damages or to hold the tenant to the lease and recover rent. The classic case enunciating this principle is Rokalor, Inc. v. Connecticut Eating Enterprises, Inc. supra, 388 and cases cited therein. If the landlord elects the former option, he may sue for damages and the measure of those damages, although not technically rent, is for all practical purposes, the amount of rent he would have collected had the lease not been breached. Id. at 389. However, under this option, the landlord must take reasonable steps to mitigate those damages. Id. at 388; Vespoli v. Pagliarulo, 212 Conn. 1, 3
(1989). If, however, the landlord elects the latter option, he does not terminate the lease. Instead, may sue to recover the rent for the remainder of the term. However, under this option there is no obligation to mitigate damages. Rokalor, Inc. supra.; Dewart Building Partnership v. Union Trust Co,4 Conn. App. 683, 687 (1985).
The defendants appear to be in general agreement with the aforementioned principles but argue that the plaintiff sustained no damages because he could not have recovered any rental due to the uninhabitability of the premises occasioned CT Page 9476 by the renovation activities undertaken to put the premises in rentable condition for the new tenant. This argument misperceives the principle of damages applicable to such a case: to place the injured party in the same position he would have been had there been no breach; Lar-Rob Bus Corporation v. Fairfield, 170 Conn. 397, 404-405 (1976); Rokalor, Inc., supra 389, as well as the principle of mitigation of damages. Had the defendant tenant not breached the lease, the plaintiff would have collected the agreed upon rental during the period of renovation. The landlord had a right to exercise his option to terminate and sue for damages, but in doing so, he also had a duty to mitigate damages. That obligation may be discharged by reasonable efforts to relet the premises. Danpar Associates v Somersville Mills Sales Room, Inc., 182 Conn. 444, 446 (1980). It is undisputed that the repairs/renovations undertaken by the plaintiff made commercial occupancy impossible during this period. However, had the tenant not breached the lease, it would have been unnecessary to mitigate damages by reletting the premises. Since it was the tenant's wrongdoing (breaching the lease) which caused the landlord to mitigate, the tenant is in no position to now complain that the such mitigation efforts also resulted in injury to him. Ancient principles of contract law first enunciated in Hadley v Baxendale, 9 Ex 341 (1854) hold the breaching party responsible for all contract damages reasonably to be anticipated to result from the breach. See, In re Parkview-Gem, Inc., 465 F. Sup. 629, 636-637 (W.D Mo, 1979); RESTATEMENT OF CONTRACTS, sec 336(2). Under the current status of the law, it was certainly foreseeable that upon a breach of a commercial lease, renovations might be required to facilitate mitigation.
The court therefore concludes that the plaintiff is entitled to recover the rent he would have recovered from the defendant during the 60 day renovation period despite the fact that the premises were made uninhabitable by the renovation activities. Based upon the evidence in the record, the court finds this amount to be $22,787.35.
Unreasonableness of the Renovations
An analysis of the defendant's other claim that the plaintiff was not entitled to renovation costs either because they were unreasonable or, in the alternative, that they were CT Page 9477 forfeited by his election under the lease agreement is now appropriate.
The evidence clearly supports the plaintiffs claim for renovation costs as well as their reasonableness. Between the time the defendants defaulted on the conditional reinstatement agreement and the time they vacated the premises, the plaintiff made various efforts to identify potential tenants to re-let the subject premises. These efforts resulted in the engagement in preliminary negotiations with three prospects. Ultimately only one serious prospect emerged — K B Toys (KB). Negotiations ensued which in July, 1991 culminated in the signing of a 10 year lease to commence in October, 1991 on financial terms similar to the defendants' lease. Essential to these negotiations and the resulting lease was the requirement by KB that prior to occupancy the premises be completely renovated at the landlord's expense commensurate with the commercial needs of KB and in accordance with their specifications.
The total costs of renovation and repair amounted to some $79,908.00. Although the renovations were extensive, they were not luxurious. In fact, they merely resulted in transforming a multi-partitioned premises formally used as a restaurant into a single room bare walls retail store (referred to in the trade as a "vanilla box") together with an exterior facade appropriate to such use. Some of the alterations included electrical rewiring and replacement of the existing single 10 ton HVAC system with a two unit 10 ton system. This item represented the single most expensive renovation costing some $17,000. Although the defendant claimed this expense was unnecessary, the record is devoid of any evidence thereof. To the contrary, the only evidence on this point was the uncontroverted testimony of plaintiff's construction manager that replacing the HVAC system was more cost efficient than the continued use of the existing system. With the exception of the electrical work, which was put out to competitive bid, all renovations were accomplished by workers in the employ of the plaintiff and supervised by a professional also in the plaintiff's employ.
In addition to the aforementioned renovations, it was also necessary for the plaintiff to remove debris and to repair damage to the premises caused by the defendants when they vacated the premises while removing certain restaurant CT Page 9478 equipment, furnishings and electrical fixtures. Because of the nature of the repairs, the cost of most of these repairs could not be isolated from the costs of the renovations. The evidence is clear, however, that all such repairs were reasonably necessary in order to put the premises in condition for re-letting. The plaintiff offered invoices for all items purchased and labor costs associated with the repairs and renovations performed. The accuracy and veracity of this documentation was undisputed. Despite the amount of the expenditures, the court cannot find that the repairs/renovations in question significantly enhanced the value of the premises. Compare, C.D. Stimson Co v. Porter, 195 F.2d 410, 414 (10 Cir. 1952).
It is well settled that a party attempting to mitigate damages is only required to use reasonable efforts to do so. Danpar Associates, supra, 446. Ordinarily, a landlord is required to attempt to re-let the premises in order to satisfy this requirement. Id.; see also, Mullings Clothing Co., 252 F. Sup. 667, 670 (D.CT., 1918). In doing so the landlord is entitled to recover from the breaching party, in addition to future rent, the reasonable costs of reletting which may include renovation and repair costs necessary for the reletting. It therefore follows from this that if the landlord is to be put in the same position he would have been as well as money could do it had there been no breach, he is also entitled to recover the reasonable expenses of mitigating damages which would necessarily include costs of repairs and renovation for refitting. See, RESTATEMENT OF PROPERTY, SECOND, Landlord Tenant, sec 21.1, reporter's notes at 315. Moreover, what constitutes reasonable costs of renovation/repair is a question of fact for the trier. Danpar Associates, supra, 446.
Applying these principles to the facts in this case, the court is satisfied that the abovementioned renovation/repairs were necessary to relet the premises and were reasonable in amount. Although the repairs/renovations in question amounted to a substantial amount of money, without such expenditures it is clear that the plaintiff in this case could not have rented the premises to any other tenant in the foreseeable future either in the condition in which they were left or in a repaired but unrenovated condition. There was a paucity of interest in the premises and no interest apparent on the horizon. Therefore had the plaintiff not reletted the CT Page 9479 premises to KB, he would have rented it to no one and the defendants would likely be liable for rent for a significant portion of the remaining term, if not for the entire remaining term. Pursuant to the terms of the lease, approximately 8.5 years remained on the lease or a maximum exposure of $960,000. Consequently, the cost of reletting the premises amounted to only a fraction of the total amount of damages the defendant was potentially exposed to.
The numbers alone would seem to suggest that the plaintiff acted reasonably in electing to relet the premises rather than allow them to remain vacant for an indeterminable time. Ironically, because of the substantial exposure to the defendant, had the plaintiff not elected to make such expenditures (for purposes of reletting), under the circumstances of this case, the defendant might have successfully interposed a defense of failure to mitigate. However, numbers alone are not controlling. When considered in conjunction with other circumstances such as the promptness in instituting mitigation efforts, the nature of those efforts, whether the efforts significantly enhanced the long term value of the premises, the availability of substitute tenants, the attempts at controlling mitigation costs, as well as balancing the size of the potential savings to be realized by the defendant against the potential exposure to the defendant, it is abundantly clear that the plaintiffs' efforts to mitigate damages in this case were reasonable.
Forfeiture by election
The defendants next claim that the plaintiff is precluded from recovery by virtue of the election to terminate the lease under the provisions of the lease. The court disagrees.
The provision relied upon is paragraph 18.02 and provides in pertinent part:
 "Should Landlord elect to re-enter, as herein provided, [as result of a breach] or should it take possession pursuant to legal proceedings or pursuant to any notice provided for by law, it may either terminate this lease or it may from time to time without terminating this CT Page 9480 lease, make such alterations and repairs as may be necessary in order to relet the premises. . ."
The defendants argue that this provision should be interpreted as precluding the plaintiff from recovering for any renovations once he elects to not to hold the tenant to the lease. In other words, the landlord under this provision could either terminate or renovate, he could not do both. The defendants further argue that since the defendant did both, he cannot now recover for any costs of renovations as damages for the breach.
This argument again misperceives the law of damages and its relationship to the legal doctrine of mitigation of damages. The doctrine of mitigation of damages is a corollary of the law of damages: the party causing the breach is responsible for all damages flowing therefrom including any expenses reasonably incurred by the innocent party in discharging his duty to mitigate those damages. See especially, Rokalor, supra, and this court's rationale under the sub-heading "Unreasonableness of the Renovations" supra.
Both cited options in sec 18.02 of the lease are consistent with these principles. Under common law, if the landlord re-entered because of a forfeiture but without terminating the lease, he held the premises for the benefit of the tenant. And, if he further elected to re-let the same, although he was not obliged to do so, he must then credit the tenant's account with any rental received from the replacement tenant. See, In Re Parkview-Gem, Inc. supra, 636-637; 49 Am.Jur.2d, Landlord Tenant, secs. 1055, 1057. This is the essence of the second option in sec 18.02 of the lease.[4] On the other hand, if the landlord terminated the lease, under the first option provided in the lease, he was nevertheless obliged by law to mitigate damages, but was also entitled to any reasonable expenses associated with his bona fide efforts to mitigate as part of his claim for damages for the breach.
It is undisputed that the plaintiff terminated the lease in question. It is also undisputed that the landlord undertook to repair and renovate the premises in order to relet them. This conduct is consistent with the first option under sec 18.02 and also consistent with his rights and duties under the law of contracts entitling him to damages — CT Page 9481 including the reasonably incurred expenses of reletting under the doctrine of mitigation of damages. Consequently, the court must reject this last argument of the defendant. Accordingly, for the reasons already expressed, the court finds the plaintiff is entitled to recover his reletting expenses in the amount of $79,908.00.
Summary of Damages
It should be noted here that it is undisputed that the defendants are entitled to credit against any liability assessed herein for payments made on account of use and occupancy in connection with the conditional reinstatement agreement. In addition, it was also stipulated that the landlord is holding a security deposit for which the defendants are entitled to credit.
Taking such credits into consideration, damages awarded. herein are summarized as follows:
 Damages awarded for accrued unpaid rent, additional rent and water charges $31,910.80
 Use and Occupancy from 11/13/91 through July 30, 1991 $74,868.14
 Damages for breach (loss of rent during renovation-period) $22,787.35
 Damages for expenses incurred in the repair/renovation of premises for reletting $79,908.00 ---------- SUB-TOTAL ALL DAMAGES. $209,474.29
LESS CREDIT FOR:
 Payments on account of Use Occupancy $30,000.00
Security Deposit $35,431.00
TOTAL CREDITS ($65,431.00)
TOTAL DAMAGES AWARDED $144,043.29[5]
CT Page 9482
Accordingly, judgement is entered for the plaintiff in the amount of $144,043.29 plus attorneys fees which are to be assessed at a subsequent hearing.
BY THE COURT,
MELVILLE, J.